**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00117-CV**
_____

**THE PREMCOR PIPELINE CO., Appellant**

**V.**

**JIM WINGATE, Appellee**

**On Appeal from the 60th District Court**
**Jefferson County, Texas**
**Trial Cause No. B-207,368**

**MEMORANDUM OPINION**

In this case, the trial court added a defined width to nine pipeline easements conveyed in 1954, when the unambiguous language in the easements lacked a defined width for the pipeline right of way ("ROW") conveyed by the grantor to the grantee. Appellant, The Premcor Pipeline Co. ("Premcor"), alleges that it is a successor in interest to the grantee of the easements. Appellee Jim Wingate ("Wingate") is a successor in interest to the Grantor of the easements. Premcor

1

complains the trial court erred by: considering parol evidence; construing its unambiguous general easements to have fixed widths; rewriting the easements to include a fixed width of twenty feet; and granting Wingate's request for declaratory relief. Premcor also complains the trial court erred by granting a permanent injunction limiting Premcor's use and enjoyment of its general easements to a twenty-foot strip of land and awarding Wingate court costs that included expert witness fees and attorneys' fees. For the reasons discussed below, we reverse the portion of the trial court's Amended Order Granting Permanent Injunction granting Wingate declaratory relief, render judgment granting Premcor's request for declaratory relief, and remand the issue to the trial court for further proceedings. We vacate the portion of the trial court's Amended Order granting Wingate a permanent injunction. We reverse the portions of the Amended Order awarding Wingate expert witness fees as costs and attorneys' fees and remand those issues to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

Premcor, which is part of the Valero family of companies that owned the Port Arthur Refinery, now owns two pipelines that run approximately eighteen miles and carry butane from the Fannett Terminal to the Port Arthur Refinery. Premcor's pipelines, one six inches and one four inches in outside diameter, cross over ninety parcels of land, and Wingate owns eleven parcels of land burdened by nine relevant

2

recorded easements (the Wingate Easements) that were conveyed in 1954 by previous landowners as Grantors to Gulf Oil Corporation and Gulf Refining Company (collectively referenced as "Gulf"). The easements, hereinafter referred to as the 1954 Gulf Easements, were transferred from Gulf to Chevron and then to Premcor.

Seven of the nine Wingate Easements provide, in pertinent part:

Grantor does hereby grant and convey unto the said Grantee, its successors and assigns, a right of way over the land hereinafter described, and the right to construct, maintain and operate thereon two pipe lines for the conveyance and transportation of oil, gas, water, steam, or any other material or substances; . . .

[legal description of specific tracts of land]

. . .

The Grantee herein, and its successors and assigns, shall have the right to do whatever may be requisite for the enjoyment of the rights herein granted, including the right of clearing said right of way of timber, and the right of ingress and egress to and from said tract of land, for the purpose of laying, maintaining, repairing, renewing, changing the size of, and restoring of pipelines, . . . and for the removal of same when desired by Grantee, its successors or assigns.

. . .

One of the nine Wingate Easements includes the following: "[I]ngress and egress to and from the right of way granted herein shall be limited to present roads or alongside fence lines and canals across the above described land." In two of the nine Wingate Easements someone removed the words "changing the size of." At least

3

one of the nine Wingate Easements contains a centerline description of the location of the right-of-way being granted.[1] There are other right-of-way agreements referenced in the appellate record which pertain to tracts of land *not owned by Wingate*, and some of those agreements appear to define a twenty-foot width for the Premcor right of way for the same two pipelines.

Jim Wingate filed suit against Premcor after a dispute developed between Premcor and Wingate regarding the use of Wingate's roads and bridges. In his Original Petition and Request for Temporary Restraining Order, Temporary Injunction, Permanent Injunction, Declaratory Relief and Damages, Wingate sought injunctive relief to prevent Premcor from trespassing on his property which is burdened by the nine Wingate Easements. Wingate alleged that in March and April 2021, Premcor threatened to deny and interfere with Wingate's full use and enjoyment of his property by indicating it intended to exceed the use granted in the nine Wingate Easements at issue, and Wingate alleged Premcor's threats would continue unless restrained by the trial court. Wingate alleged that Premcor failed to demonstrate any authority, license, or easement to use his real property beyond the fixed and certain easement established upon the laying pipeline, and Premcor's continued threatened interference with Wingate's use and enjoyment of his property

---

[1]See File No. 368367, Victor Aubey's grant to Gulf dated January 28, 1954, recorded in the Deed Records of Jefferson County, Texas.

would cause Wingate to suffer irreparable harm for which there is no adequate remedy at law. Wingate asked the trial court to limit Premcor's access to the fixed and certain boundary established upon the laying of the pipeline in accordance with the Texas Supreme Court's holding in *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662, 665–66 (Tex. 1964).

Wingate requested declaratory relief, seeking to have the trial court declare the area of the fixed and certain boundary established upon the laying of the pipeline, which Wingate argued is determined by using the circumference of the previously laid pipelines. Wingate asked the trial court to construe his rights to his real property, including his full use and enjoyment upon the property free of preclusion, impairment, or interference from Premcor, and his rights to recover damages and attorney's fees incurred as a result of Premcor's actions. Wingate requested a hearing for a temporary injunction.

Premcor filed an Answer along with a request for Declaratory Relief and Counterclaims, alleging that its easements do not specify a certain width of the ROW and that Premcor has a blanket right of ingress and egress to and from its pipelines, including the right to use existing roads to access its pipelines. Premcor requested that the trial court declare it has unlimited reasonable use of the nine Wingate Easements such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner.

The trial court issued a Temporary Restraining Order and Order to Show Cause Why Temporary and Permanent Injunction Should Not Issue and conducted a hearing on Wingate's Application for Temporary Injunction. In its Response to Request for Temporary Restraining Order, Temporary Injunction, and Declaratory Relief and Counterclaims, Premcor argued the 1954 Gulf Easements do not specify a certain width of the ROW or limit Premcor's access to the fixed and certain easement established upon the laying pipeline. Premcor argued that Texas courts have been reluctant to write fixed widths into easements when the parties never agreed to a particular width, and express general easements without a fixed width imply a grant of unlimited reasonable use that is reasonably necessary and convenient and as little burdensome as possible to the servient owner. Premcor's counterclaim sought declaratory relief and to have the trial court construe its rights under the 1954 Gulf Easements and declare it has unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner.

In June 2021, the trial court conducted a temporary injunction hearing. Wingate's counsel explained they had to move forward with injunctive relief to prevent Premcor's unfettered and unrestricted access across Wingate's property, which would be an abuse of Premcor's rights under the 1954 Gulf Easements. Wingate's counsel argued that Premcor intended to use its right of ingress and egress

and divert off their ROW by using spoil bank roads and a bridge Wingate erected in 2018.[2] Wingate's counsel argued that case law held Premcor's easement to a minimum amount, which is the width of the pipes.

Premcor's counsel stated that in April 2021, Premcor completed the pig run[3] without accessing Wingate's property or using the 1954 Gulf Easements, and the pig run preliminary report showed no anomalies. Premcor's counsel explained that Premcor had no reason to access Wingate's property until it conducted its next pig run sometime before 2023, and there was no imminent harm or irreparable damage to justify an injunction. Premcor's counsel stated that the primary issue was whether Wingate could establish a probable right of recovery when case law states a trial court cannot use extrinsic evidence to rewrite or add terms to an easement. Premcor's counsel argued Wingate could not establish a right of relief under his declaratory judgment action because the 1954 Gulf Easements do not contain a defined width, and without a defined width, Premcor is allowed reasonable and necessary use for the object of the easement, which is to maintain and operate pipelines. Premcor's counsel maintained than an injunction should not take place without a probable right to relief in Wingate's declaratory judgment action, and there is no probable injury

---

[2]The parties agree that the roads and bridge in question are private roads owned by Wingate located on Wingate's land.
[3]In this specific situation, a "pig run," also referred to as an in-line inspection, involves running a smart tool machine through the inside of the pipe to pick up defects and anomalies, such as dents or corrosion.

because the harm is not imminent, and the injury is not irreparable because Premcor could pay any damages caused to the easements.

Wingate testified that Airport Road did not exist in 1954, and he had allowed Premcor to use Airport Road on a case-by-case basis in exchange for two loads of rock. Wingate testified that based on Premcor's March 2021 letter indicating its intent to access his property and Premcor's agent's representation that Premcor had the right of ingress and egress and **unfettered use** of his properties, he believed Premcor intended to take liberties beyond the scope of its rights under the 1954 Gulf Easements, including crossing ditches and Burrell Gully. Wingate testified that Premcor's pleading, which stated that its blanket right of ingress and egress to its pipelines include the use of roads, led him to seek injunctive relief because he believed Premcor intended to access Airport Road and other areas of Wingate's property outside the scope of its easements. During his testimony, Wingate agreed that in an April 2021 email that Premcor's agent, Jody Lambright, sent to Wingate's counsel prior to Wingate filing his petition for a temporary restraining order and temporary injunction, Lambright, stated that Premcor was anticipating access down the ROW next week to drop boxes at locations above the pipelines for the maintenance of the pipeline in the ROW for its upcoming in-line inspection tool.

Wingate agreed that "[t]he width is not specified[]" in the 1954 Gulf Easements, but he believed Premcor's ROW is within a cleared area measuring sixty

8

to sixty-five feet wide. Wingate testified that the cleared area allowed Premcor to access most of the pipelines using Boondocks Road (a road that is not claimed by Wingate). Wingate testified that he knew his properties were encumbered by the 1954 Gulf Easements when he purchased them. Wingate further testified that at the time of the June 2021 hearing, Premcor had not advised him about any additional work it planned to conduct on his property concerning the current project, and Premcor's next project was planned for 2023.

Robert Wade, Wingate's expert witness on easements, testified that Premcor's pleadings and correspondence, including its Motion for Continuance, shows it was asserting that it was "entitled to unfettered, unrestricted, reasonable and necessary use of the entire tract[,]" which exceeded what it should have received under the easements. Wade opined that based on Premcor's Motion and threatened excess use of the easement, Wingate was reasonable in proceeding with litigation and seeking injunctive relief. Wade explained that based on caselaw, Premcor's four and six-inch lines would be the width of the easement, which became fixed and certain when the pipe was installed, and the easement would not include Burrell Gully, Airport Road, or other roads or bridges that did not exist when the easement was created. Wade further opined, over Premcor's objection, that Premcor's lines could run efficiently within a twenty-foot easement, which would be reasonable in the industry.

9

Wade agreed that the easements at issue in this case did not have defined widths, and that case law restricts a landowner from limiting an undefined width to a certain width. Wade testified that in cases involving easements with undefined widths, the easement holder could use as much land as reasonable for the easement's original purpose with the least amount of burden to the servient estate. Wade explained the reasonable use of any easement is determined by the easement's historical use and what was reasonable when the easement was created. Further, that use would not include using bridges and roads created after the easement. Wade testified that an extrinsic document attached to one of Premcor's pleadings showed a property bordering the Wingate Ranch that has a twenty-foot easement in the same pipeline corridor. Wade opined that he sees "no problem with them operating a 4-inch and a 6-inch line within a 20-foot easement."

Premcor sought a directed verdict based on Wingate's failure to establish any imminent harm absent evidence that Premcor intended to use the ROW before the trial on the merits. Concerning Wingate's declaratory judgment action, Premcor argued Wingate failed to establish the necessary elements for injunctive relief because there was no evidence of any irreparable harm. The trial court overruled Premcor's objections.

Premcor presented testimony from Adam James of Pinnacle Resources Group, who testified he was Valero's and Premcor's ROW agent for the March/April

10

2021 in-line inspection project. Adams explained he sent Wingate the March 2021 notification letter of the upcoming maintenance work on the Valero/Premcor easement, and he explained the letter did not threaten to use any roadways on Wingate's property without his knowledge or to cross his property in any way other than the use of the easement. Adams testified he provided Wingate with a map showing the above ground markers (AGM) Valero intended to place on his property.

Adams further testified that Wingate's counsel offered the use of Wingate's existing ranch roads in exchange for signing Wingate's own agreement with indemnity, paying a $2,500 legal fee, and providing nine loads of rock. Adams explained that he contacted Lambright and David Delgado of Valero/Premcor, who advised him that they had a handshake agreement with Wingate to provide two loads of rock in exchange for road access to drop the AGM boxes on the ROW, but Wingate's counsel said the handshake agreement was no longer valid. Adams testified that when the parties failed to reach an agreement, Wingate's counsel told them not to get off the ROW or they would be trespassing.

Lambright, Senior Manager for Valero's Gulf Coast assets, testified the ROW could be accessed by Boondocks Road or Airport Road, which could not be used without Wingate's knowledge. Lambright explained Valero completed the in-line inspection of the six-inch pipe and the preliminary report showed there were no immediate repairs, and it was in good shape, but multiple configuration digs, which

11

to his knowledge would not occur on Wingate land, would be conducted to confirm the report. Lambright testified the four-inch pipeline was due for an in-line inspection, commonly referred to as a pig run, around 2023, and there were no plans to access the ROW until then. Lambright explained that since he took over in 2008, Valero provided Wingate two loads of rock a year, and although Wingate claimed it was in exchange for maintaining the ROW, changing signs, and painting fence posts, Lambright thought it was because he needed to access Airport Road to set out the AGM boxes for the in-line inspections.

Lambright testified that during the 2021 project, he did not use Airport Road to access the ROW or place any AGM boxes on Wingate's property. Lambright explained that he believed Wingate's counsel's request for $2,500 to prepare an indemnification document and nine loads of rock was "a little bit more than what we should be doing at this point," and "Valero would not sign a[n] indemnification document that it didn't prepare." Lambright further explained that Wingate's counsel said he would accept eight loads of rock, $2,500, and the indemnification, but Lambright told him it was "above his pay grade" to enter into contractual agreements. Lambright testified that his conversations with Wingate's counsel gave him the impression that if he did not make the agreement, "we could be paying through the nose the next time we had to come out there." Lambright denied making threats to access Wingate's property "no matter what[]" and explained that using

12

Airport Road was convenient, but they also had ingress and egress rights to the ROW and could use Boondocks Road to then walk the ROW and drop the AGM boxes. Lambright explained that a man could also swim across Burrell Gully with the AGM boxes at a low water crossing within the ROW.

Lambright testified that at Wingate's counsel's request, he sent the April 2021 email explaining Valero anticipated accessing down the ROW to drop boxes at locations above the pipeline. Lambright explained that after the parties failed to reach an agreement regarding the indemnification to use the road, Wingate's counsel advised him he had filed a temporary restraining order to stop them from going on the property at all, despite Premcor's right under the easement agreements to access the ROW from Boondocks Road. Wingate testified that there was no reason for Wingate to be in any imminent harm regarding Premcor using Airport Road or accessing the ROW.

The March 2021 notification email from Premcor to Wingate was introduced into evidence and states, "Due to the terrain of the ROW, the crews may need to use boats, ATVs or UTVs to access certain areas of the ROW during the ILI tool run." The email also states that "manned crews may be parked on the ROW at various times during the inspection, and we did not want you to be startled if you see a crew member on our ROW or along the road at various times during the day or night." The evidence includes James's March 15, 2021 email to Wingate explaining

Premcor would be conducting a tool run through the pipeline on his neighbor's property which would "involve contractors walking and on UTV's (side by sides) along the pipeline following the tool, within the confines of our existing Easement." The evidence also includes James's March 31, 2021 email to Wingate's counsel, which included the maps showing the placement of the AGM boxes. Lambright's April 8, 2021 email to Wingate's counsel regarding "Wingate Property Road access negotiation[,]" states Wingate rejected Premcor's counteroffer to provide four loads of rock without an indemnity agreement and that Premcor was "anticipating access down the row next week to drop boxes at locations above the pipeline for the maintenance of the pipeline in the row for our upcoming inline inspection tool."

After hearing testimony and considering the evidence and case law, the trial court granted Wingate a temporary injunction. In its Order Granting Temporary Injunction, the trial court found: Wingate presented a *prima facie* case for probable recovery against Premcor; that unless restrained, Premcor will alter the *status quo* and tend to make ineffectual a judgment in Wingate's favor; and Wingate will suffer an immediate and irreparable harm for which there is no adequate remedy at law to reimburse Wingate for his losses unless Premcor is restrained to preserve the *status quo* until trial. The Order Granting Temporary Injunction states:

> [T]he 1954 Gulf . . . easements . . . granted the right to install two and only two pipelines, that Gulf Oil Corporation and Gulf Refining Company installed a four (4") inch pipeline and a six (6") pipeline in the 1954 Gulf easements, that no evidence was presented establishing

14

that Plaintiff's road, referred to as Airport Road, or Plaintiff's bridge over Burrell Gully, were appurtenant to the 1954 Gulf Easements, or even existed at the time of the 1954 Gulf easements, that the 1954 R.M. Wingate to Gulf Oil Corporation and Gulf Refining Company easement . . . does not allow the size of the pipelines to be changed, that, by the installation of the four (4") inch pipeline and a six (6") pipeline, the 1954 Gulf easements became fixed and certain under *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 622 (Tex. 1964), that the facts of *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678 (Tex. 2020) were distinguished from *Dwyer* and likewise distinguished from this case, and therefore, the Court should enter such Temporary Injunction against Defendant The Premcor Pipeline Co.;

It is, Therefore, **ORDERED**, **ADJUDGED** and **DECREED** that Defendant The Premcor Pipeline Co., its servants, agents, employees, attorneys, executors, administrators, guardians, trustees, heirs, successors and assigns, are hereby enjoined and restrained from using or threatening to use any of Plaintiff's real property, roads, bridges or other improvements located more than ten (10') foot on either side of the centerline of the existing Gulf Oil Corporation and Gulf Refining Company four (4") inch and six (6") pipelines on the real properties installed, fixed and certain pursuant to the 1954 Gulf easements.

Wingate filed a Motion to Make Temporary Injunction Permanent, stating the trial court's temporary injunction enjoining Premcor from using or threatening to use any of Wingate's real property, roads, bridges, or other improvements located within ten foot on either side of the centerline of the existing Gulf four inch and six inch pipelines pursuant to the 1954 Gulf Easements is consistent with Premcor's multiple easements obtained from nearby landowners regarding said pipelines, which all specify a width of twenty feet. Wingate argued Premcor had failed to offer

15

any new evidence to create a genuine issue that Premcor is entitled to more use than is allowed under the temporary injunction.

Premcor filed a Response to Plaintiff's Motion to Make Temporary Injunction Permanent, arguing that the nine relevant 1954 Gulf Easements are general or blanket easements that do not have a defined width and only restrict Premcor to reasonable and necessary use of the Wingate property encumbered by the easements. Premcor argued there were no restrictions in the 1954 Gulf Easements for roadways or bridges that were later constructed within the easements and with the property owners' actual or constructive knowledge of the easements except that Premcor must pay Wingate for any damages caused by the operation, repair, or removal of pipelines. Premcor explained the trial court did not consider its counterclaims during the temporary injunction hearing, and it intended to present testimony regarding its counterclaims at trial on the permanent injunction.

Wingate filed a Reply to Premcor's Response Plaintiff's Motion to Make Temporary Injunction Permanent, explaining that injunctive and declaratory relief was necessitated after Premcor threatened immediate exercise of unfettered, unrestricted reasonable and necessary use of Wingate's property subject to the 1954 Gulf Easements, including the threatened use of a bridge, roads, and improvements that did not exist in 1954. The trial court denied Wingate's Motion to Make Temporary Injunction Permanent.

16

Premcor filed a Motion to Exclude Robert Wade and Ken Whitlow as witnesses, arguing that their legal opinions should be excluded because they amount to nothing more than a legal conclusion based on the application of case law to the facts of the case. Wingate filed a Response to Defendant's Motion to Exclude Robert Wade and Ken Whitlow and noted the trial court had overruled Premcor's objections to Wade testifying at the temporary injunction hearing. Wingate argued Wade's testimony and consulting expert Whitlow's letter upon which Wade's opinions rely are permissible because they relate to mixed questions of law and fact. The trial court conducted a hearing on Premcor's Motion to Exclude and stated it would take the matter under advisement. The trial court also noted that to the extent the parties agree, any witness testimony and evidence admitted during the temporary injunction hearing would be included as evidence in the permanent injunction trial.

Seven days prior to trial, Wingate filed Plaintiff's First Amended Original Petition and Request for Declaratory Relief, Permanent Injunctive Relief and Damages. In the First Amended Original Petition as in the Original Petition, Wingate requested that the trial court declare the area of the fixed certain boundary established upon the laying of the existing pipeline in accordance with *Dwyer*; however, in the First Amended Original Petition, Wingate eliminated the specific request that the court use the circumference of the previously laid pipeline to do so. Wingate also added a claim for abuse of process.

17

During the permanent injunction bench trial, Lambright testified there are other twenty-foot easements located along the eighteen-mile stretch of the four-and six-inch pipelines. When asked if a seventy-five-foot ROW was necessary for Premcor to run their product and maintain their lines, Lambright responded that it might need more than that if it was trying to dig up a line. Lambright agreed that over the past fourteen years he had used less then seventy-five feet, and at times, twenty feet or less. Lambright explained there are five pipelines in the ROW, and he assumed the open area was less than seventy-five feet.

Wingate testified "the corridor" measures sixty-seven feet and is lined by trees, and he explained "the corridor" is part wooded and part pastureland. Wingate testified that most of the operations have been done within a confined seventy-five foot area. Wingate explained a blanket easement would cover the entire tract of land, which Premcor has never used because it has been confined to the ROW. Wingate testified that an unfettered, unrestricted blanket easement is unnecessary on the corridor and has never been used, and he explained such use would be a "burdensome limit no one could live with." Wingate testified in recent years, he has given a ROW within five to twenty-five feet, which is what Premcor's easement should be. Wingate further testified that other landowners have given Premcor a twenty-foot easement along the corridor at issue, and "normally in my experience the pipeline companies come back and ask for an additional work space area."

18

Wingate also testified that he has incurred more than $200,000 in attorney's fees, which he thinks is excessive for litigating this small project.

Wade testified that other landowners along the corridor have given a twenty-foot-wide easement. Wade testified the terms of the temporary injunctions should be permanent, and he does not believe Premcor should have a fifty-foot easement when most of the line is restricted to a twenty-foot width. Wade further testified that he has never seen a pipeline company claim unfettered and unrestricted rights to a landowner's property, and he opined that it was necessary for Wingate to seek a temporary restraining order and pursue litigation.

Wade agreed basic contract law applies to easements and that a court is not permitted to rewrite an agreement or add to its language. Wade opined the undefined easements at issue became fixed and certain when the pipelines were installed and were four and six inches wide. Wade testified that Premcor "[s]hould be able to[]" remove a six-inch pipeline within a six-inch space. Wade further testified that Wingate could sue Premcor for trespass if it got "outside the fixed and certainties when it's defined by . . . *Dwyer*."

Chad Pomeroy, Premcor's expert on Texas property law, testified about the scope of the 1954 Gulf Easements. Pomeroy testified that since there is no width defined in a certain number of feet, the scope is defined in terms of the use and purposes articulated in the granting language. Pomeroy explained that since

easements filed first in time have priority over subsequent easement holders, the 1954 Gulf Easements have priority over the DD7 easement which contains a gully, and Premcor has the right to cross the DD7 easement to gain access across its easement. Pomeroy testified that *Southwest Electric Power Co. v. Lynch*, 595 S.W.3d 678, 685 (Tex. 2020) ("*SWEPCO*") states general easements without a width are acceptable in Texas, and courts should not rewrite them to add limits. He explained that the parties were free to have an easement defined by use or purpose rather than feet. He noted that presumably, the parties did not want a width for a purpose and that is what they negotiated it for. Pomeroy further testified the only way a landowner can limit an easement is to renegotiate with the easement holder, and he explained that a landowner can sue for trespass if the easement holder does not use the easement as is reasonably necessary to the particular use and purpose articulated in the grant.

Pomeroy explained that even with testimony concerning reasonable and necessary use, trial courts cannot rewrite general easements and limit them to a certain number of feet in width because "you get the opportunity on an ongoing basis on each occasion that you need to use it to assess what is reasonable and necessary." He testified the 1954 Gulf Easements contain forward-looking language that anticipates future activities that my change, and unlike *SWEPCO*, *Dwyer* did not contain forward-looking language but "indicated the parties' intent that once you use

20

it in a particular way, you're stuck." Pomeroy further testified that the Whitlow letter upon which Wade relied does not state that undefined easements do not exist or that once you put a pipeline in that it has a defined width but states that "because blanket easements potentially apply anywhere and because there's no limited width in terms of a certain number of feet, they can be very difficult for landowners to deal with."

Although Premcor argued the easements speak for themselves and the trial court could not add any terms, it presented Ryan Hebert's testimony purely in the alternative. Hebert, the Vice President of Pipeline Operations for WHC Energy Services, testified he reviewed the easements and the uses or projects allowed under the easements, and he explained he usually uses a fifty-foot ROW to repair a pipeline and eighty-five to ninety feet to do a renewing project. Hebert explained his estimates were a general minimum and that it was typical to need extra workspace due to a route's specific features. Hebert also explained that Premcor has two pipelines, which would require more space. Hebert testified that sixty-seven to seventy feet is inadequate for Premcor to repair, renew, restore, or change the size of its pipelines. Hebert further testified that it would require eighty-five to ninety feet, which he believed was reasonable and necessary, to perform the activities the easements allowed and that certain features could require more.

The trial court entered an Amended Order Granting Permanent Injunction, denying Premcor's request for declaratory judgment, granting Wingate's claims for declaratory and injunctive relief, and permanently enjoining and restraining Premcor

> from using or threatening to use any of Plaintiff's real property, roads, bridges, or other improvements located more than ten (10') foot on either side of the centerline of the existing Gulf Oil Corporation and Gulf Refining Company (4") inch and six (6") [sic] pipelines on the real properties installed, fixed and certain pursuant to the 1954 Gulf easements.

The trial court awarded Wingate his attorney's fees and court costs, which included expert witness fees. In its Findings of Fact and Conclusions of Law, the trial court found, among other things, that all the 1954 Gulf Easements that defined the pipeline corridor's width limited the pipeline corridor's width to twenty feet. The trial court concluded:

> Under *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662, 665 (Tex. 1964), the pipe(s) laid defined any missing dimension specificity so that it/they became fixed and certain thereby and have not moved for 67 years, and further, the missing dimensions must be inferred to be such as are reasonably sufficient for the accomplishment of purpose . . . and required to be as little burdensome as possible to the servient owner,[] so that the dimension of the width of (20') feet must be inferred by the evidence that the eighteen pipeline corridor under the 1954 Gulf easements has been laid, operated and maintained within that (20') foot width for the past 67 years[.]

The trial court also concluded, among other things: Premcor had no type of easement to Airport Road; Wingate is awarded costs and expenses; the parties' legal experts were deemed appointed by the Court and the cost of the expert fees awarded at

Premcor's expense was equitable and just; the court should grant Wingate declaratory relief and enter the permanent injunction against Premcor because Wingate would suffer immediate and irreparable harm for which there was no adequate remedy at law to reimburse Wingate for his losses unless Premcor was restrained from exercising dominion over Wingate's land beyond the twenty-foot wide pipeline corridor so as to include Airport Road and Burrell Gully Bridge; and Wingate is awarded his reasonable and necessary attorneys' fees in his declaratory relief action.

## ANALYSIS

### Declaratory Judgment

In issue one, Premcor complains the trial court erred by considering parol evidence and construing its unambiguous general easements to have fixed widths. Premcor argues general easements are recognized under Texas law as unambiguous contractual agreements that courts cannot rewrite because one party believes a provision is unfair. Premcor argues that since a lack of fixed measurements does not make a general easement ambiguous, there was no legal basis for the trial court to consider parol evidence in interpreting the unambiguous easements. Premcor contends that regardless of whether there is evidence concerning the amount of feet sufficient for the easements' purposes, a trial court cannot rewrite a general easement to include a fixed width. Premcor asks this Court to reverse the trial court's judgment

granting Wingate declaratory relief and grant it declaratory relief consistent with the easements' plain language and governing case law.

We review declaratory judgments under the same standards as other judgments and decrees. Tex. Civ. Prac. & Rem. Code Ann. § 37.010. "We look to the procedure used to resolve the issue at trial to determine the standard of review on appeal." *Eisen v. Capital One, Nat'l Assoc.*, 232 S.W.3d 309, 310 (Tex. App.—Beaumont 2007, pet. denied) (citation omitted); *see also VEL Holdings, LLC v. Milhorn Dev., LLC*, No. 09-17-00464-CV, 2019 WL 3022545, at *3 (Tex. App.—Beaumont July 11, 2019, no pet.) (mem. op.). When a trial court enters a declaratory judgment after a bench trial, we apply a sufficiency standard to review the findings of fact and review the trial court's conclusions of law de novo. *SWEPCO*, 595 S.W.3d at 683; *Estate of Martinez*, No. 04-22-00708-CV, 2024 WL 697102, at *1 (Tex. App.—San Antonio Feb. 21, 2024, no pet.) (mem. op.) (citation omitted). We will reverse a trial court's conclusions of law only if they are erroneous as a matter of law. *Estate of Martinez*, 2024 WL 697102, at *1 (citation omitted); *see also BMC Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) (explaining reviewing court may review trial court's legal conclusions drawn from the facts to determine their correctness).

Premcor's first issue requires interpretation of the 1954 Gulf Easements. We review a trial court's interpretation of contracts granting easements de novo.

*Greenwood v. Lee*, 420 S.W.3d 106, 111 (Tex. App.—Amarillo 2012, pet. denied) (citation omitted). An easement holder's rights are limited to those that are expressed in the grant, and a party's use cannot exceed the rights expressly conveyed by the easement. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002); *OHAH Ltd. v. LNG Builders, LLC*, No. 09-20-00292-CV, 2022 WL 16986573, at *10 (Tex. App.—Beaumont Nov. 17, 2022, pet. denied) (mem. op.); *Atmos Energy Corp. v. Paul*, 598 S.W.3d 431, 443 (Tex. App.—Fort Worth 2020, no pet.) (citations omitted). The law balances the rights of the parties to an easement by prohibiting the servient estate holder, the owner of the underlying fee, from interfering with the rights of the dominant estate holder, or the holder of the easement, to use the easement for the purposes for which it was granted. *Atmos Energy Corp.*, 598 S.W.3d at 443. Our primary concern is to ascertain the parties' true intentions as expressed in the instrument, and in doing so we must read the agreement as a whole to determine the parties' intentions and to carry out the easement's purpose. *Id.* at 444 (citation omitted). In doing so, we must respect the parties' freedom of contract and enforce the terms the parties entered into as long as the agreement does not violate the law or public policy. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017) (citations omitted) (noting the long recognized and strong public policy in favor of preserving parties' freedom to

25

contract); *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex. 2007) (citation omitted) (same).

"'We apply basic principles of contract construction and interpretation when considering an express easement's terms.'" *Austin JSB, Ltd. v. Otwell Realty, Ltd.*, No. 03-22-00459-CV, 2023 WL 5311524, at *4 (Tex. App.—Austin Aug. 18, 2023, pet. denied) (mem. op.) (quoting *Marcus Cable*, 90 S.W.3d at 700). "The starting point of any exercise in easement construction is the same as for contract interpretation: the easement's plain language." *SWEPCO*, 595 S.W.3d at 689 (citation omitted). "If the easement's terms are ascertainable and can be given legal effect, courts will not supplant the easement's express terms with additional terms nor consult extrinsic evidence to discern the easement's meaning." *Id.* (citation omitted); *see Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) (stating trial court may neither rewrite the parties' contract nor add to its language).

The Texas Supreme Court has "recognized the existence of general easements that do not require a fixed width[,]" and due to that recognition, "courts have long been reluctant to write fixed widths into easements when the parties to the easements never agreed to a particular width." *SWEPCO*, 595 S.W.3d at 690; *see Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974) (stating a grant of a general easement implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner); *Crawford v.*

26

*Tenn. Gas Transmission Co.*, 250 S.W.2d 237, 240 (Tex. App.—Beaumont 1952, writ ref'd) (refusing to limit a gas company's use of land for a pipeline to a fifty-foot strip when easement did not specify a width because such limitations would alter the stated purpose for which the grant was made); *Childress*, 187 S.W.2d at 940 (refusing to confine an easement to a thirty-foot strip of land when it did not specify a width). "The use of a general easement without a fixed width is a strategic decision that does not render an easement ambiguous or require a court to supply the missing term." *SWEPCO*, 595 S.W.3d at 690 (citation omitted). The lack of a specified width does not mandate the admission of extrinsic evidence to prescribe a width, as doing so "obviates the flexibility that general easements afford the parties who bargained for the terms of an express easement." *Id.* at 689.

Since a general easement without a fixed width does not render an easement ambiguous, the court is obligated to interpret the easement as a matter of law, and the plaintiff must rely on the instrument alone because "[t]he parol evidence rule bars consideration of evidence that contradicts, varies, or adds to the terms of an unambiguous agreement." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019) (citation omitted); *Atmos Energy Corp.*, 598 S.W.3d at 444 (explaining when language is not ambiguous, the court is obligated to interpret contract as a matter of law); *see also DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999) (same); *Coleman*, 514 S.W.2d at 903 (explaining

27

plaintiffs must rely on instrument alone when easement contains no ambiguity). Since the parties have not argued that the 1954 Gulf Easements are ambiguous, we must rely solely on those written instruments alone and not consider any evidence that contradicts, varies, or adds to the terms. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 483; *Coleman*, 514 S.W.2d at 903.

Applying the basic principles of contract construction and interpretation, looking solely at the language of the 1954 Gulf Easements, ascertaining the parties' true intent, respecting the parties' freedom of contract, and considering the relevant caselaw that provides that the use of a general easement without a fixed width does not render an easement ambiguous, we hold the 1954 Gulf Easements are unambiguous and must be interpreted as a matter of law without considering any extrinsic evidence that contradicts, varies, or adds to the terms of the unambiguous easements. *See SWEPCO*, 595 S.W.3d at 690; *Barrow-Shaver Resources Co.,* 590 S.W.3d at 483; *Shields Ltd. P'ship*, 526 S.W.3d at 481; *Austin JSB, Ltd.*, 2023 WL 5311524, at *4; *Atmos Energy Corp.*, 598 S.W.3d at 443–44.

Having concluded the 1954 Gulf Easements are unambiguous, we must interpret the easements as a matter of law. *See SWEPCO*, 595 S.W.3d at 683; *DeWitt Cnty. Elec. Coop., Inc.*, 1 S.W.3d at 100; *Estate of Martinez*, 2024 WL 697102, at *1; *Atmos Energy Corp.*, 598 S.W.3d at 444. Our task then is to determine whether the trial court erred by granting Wingate declaratory relief which found that

28

Premcor's rights under the 1954 Gulf Easements are now fixed to a permanent twenty-foot wide easement on Wingate's real property. The twenty-foot easement is defined by the trial court as ten feet on either side of the centerline of the existing four inch and six inch pipelines. In reaching its determination that the 1954 Gulf Easements have a fixed width of twenty feet, the trial court relied on *Dwyer* and found that *SWEPCO* did not apply in this case.

We conclude that the trial court erred in permanently fixing a twenty-foot width to the nine Premcor easements. We hold that based on the facts here, *SWEPCO* is directly on point. In *SWEPCO*, the Texas Supreme court stated parties that enter into easements are certainly capable of writing a fixed width in the easement, and "[t]he use of a general easement without a fixed width is a strategic decision that does not render an easement ambiguous or require a court to supply the missing term." *SWEPCO*, 595 S.W.3d at 690. The *SWEPCO* Court noted that because landowners purchase properties aware of encumbrances, such as easements, "landowners are charged with notice of easements that may encumber their property, including easements that do not contain a specific width but instead include general language." *Id.* (citation omitted). In this case, Wingate purchased his properties knowing they were encumbered by the 1954 Gulf Easements, which he agreed did not specify a width.

Wingate had notice that his properties were burdened by general easements with no defined width and that the 1954 Gulf Easements granted Premcor the right of ingress and egress to and from the described tracts of land for the purpose of, among others, maintaining and repairing the pipelines.[4] Still, Wingate is not without recourse as to Premcor's use of the easements, because as the holder of a general easement, Premcor must "utilize the land in a reasonable manner and only to the extent that is reasonably necessary," and as little burdensome as possible to the servient owner. *See id.* (citing *Severance v. Patterson*, 370 S.W.3d 705, 721 (Tex. 2012) (stated existence of easement in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner)); *see also Atmos Energy Corp.*, 598 S.W.3d at 456 (explaining blanket easements do not mean the existence of an easement that grants unrestricted use of the entire tract but that the grantee merely has a vested interest in such land to use it for the purposes authorized in the instrument).

The *SWEPCO* Court distinguished the easements in that case, which contained broad, forward-looking language that granted, among other rights, the

---

[4]We note that one of the 1954 Gulf Easements limit ingress and egress to and from the ROW to "present roads or alongside fence lines and canals across the above described land."

30

right to reconstruct, inspect, patrol, and maintain lines and appurtenances, from the easements in *Dwyer*, which did not include such broad, forward-looking language, or define a course for the pipeline to follow. *SWEPCO*, 595 S.W.3d at 688–89; *see Dwyer*, 374 S.W.2d at 663. Like *SWEPCO*, the 1954 Gulf Easements grant Premcor the right "to do whatever may be requisite for the enjoyment of the rights herein granted," including the right of ingress and egress to and from said tract of land for the purpose of, among others, "laying, maintaining, renewing, changing the size of, and restoring" the pipelines. *See SWEPCO*, 595 S.W.3d at 688–89. We also hold *Dwyer* is distinguishable from the facts here.

In *Dwyer*, after the pipeline company removed an eighteen-inch pipeline and replaced it with a thirty-inch pipeline, the plaintiff sought a judgment declaring the pipeline easement across her property had lapsed or terminated based on the removal. *See Dwyer*, 374 S.W.2d at 663. The *Dwyer* agreement's granting clause stated the following before the parties made certain deletions: "does hereby grant, sell and convey unto second party a right of way to lay, maintain, operate, repair and remove a Pipe Line for the transportation of gas." *Id.* The parties struck out the words "and remove" and deleted a paragraph in the habendum clause giving the right to construct additional pipelines. *Id.* The agreement, which authorized the removal of the pipeline upon termination of the easement, did not contain specifications for the

31

size of the pipeline, prescribe a centerline description or a metes and bounds for the easement, nor did it define a course or direction for the pipeline. *Id.*

The *Dwyer* Court held that the terms "operate" and "maintain" are broad enough to include the right to remove and replace the original pipe with pipe of the same size when necessary and that the pipeline's easement rights did not terminate by removing the original 18-inch pipe. *Id.* at 664. The plaintiffs also argued the pipeline did not have the right to construct the thirty-inch pipeline, and the pipeline company argued that if plaintiffs did not want it to replace and increase the size of the pipeline, it was plaintiff's obligation to provide against that right in the agreement and any ambiguity in the agreement is resolved against the grantor. *Id.* The *Dwyer* Court noted that any ambiguity in an instrument granting an easement is resolved against the grantor and when an instrument is opened to two reasonable constructions, it will be strictly construed against its author, which was the pipeline company. *Id.* at 665 (citations omitted).

The *Dwyer* Court explained that if the pipeline's contention was correct that the agreement "authorized an increase in the size of the pipeline every time an increased demand for gas made such enlargement necessary, the extent of the easement could never become fixed or definitely ascertainable." *Id.* The *Dwyer* Court held that when the pipeline company "constructed its 18-inch pipeline with the consent and acquiescence of the plaintiff, the extent of the defendant's easement

32

rights under the 1926 agreement became fixed and certain[,]" and "[d]efendant was not authorized to remove this 18-inch line initially constructed and replace it with a line of substantially greater size." *Id.* at 666 (citation omitted).

Importantly, the *Dwyer* Court never addressed whether a court can rewrite a general easement to include a fixed width. *See id.* at 664–66. Instead, it dealt with an easement that was an "over, across and through" easement, with no course or location set forth in the easement agreement, and the agreement did not include the right to increase the size of the original pipeline, or lay additional pipelines, and the Court concluded that the easement became "fixed and certain" when the original eighteen-inch pipeline was laid. *See id.* at 666. The *Dwyer* Court concluded the parties did not intend for the plaintiff's land to be burdened with "an easement which might be enlarged over and over again, as often as an increase in demands for gas might make it necessary." *Id.* at 665–66. The *Dwyer* Court did not address the issue we face here–whether a trial court can rewrite a general easement to include a fixed permanent width. We hold the trial court erred by concluding that based on *Dwyer*, "the dimension of the width of (20') feet must be inferred by the evidence that the eighteen pipeline corridor under the 1954 Gulf easements has been laid, operated and maintained within that (20') foot width for the past 67 years[.]"

Accordingly, we conclude the trial court erred by granting Wingate declaratory relief and declaring a fixed permanent width of twenty feet for the 1954

33

easements. We further conclude that since the 1954 Gulf Easements do not limit Premcor's use to a twenty-foot ROW, the trial court erred (1) by rewriting the general easements to include a fixed width, and (2) by denying in part Premcor's requested declaratory relief because Premcor is entitle to  that use which is reasonably necessary and convenient for the purposes outlined in the easements, and which is as little burdensome as possible to the servient owner. *See SWEPCO*, 595 S.W.3d at 690 (stating a grant of a general easement implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner); *Severance*, 370 S.W.3d at 721 (same); *Coleman*, 514 S.W.2d at 903 (same); *see also Crawford*, 250 S.W.2d at 239–40 (refusing to limit use of land to a fifty-foot strip when easement did not specify a width); *Childress*, 187 S.W.2d at 939–40 (refusing to confine an easement to a thirty-foot strip of land when it did not specify a width). We sustain issue one. We reverse the portion of the trial court's Amended Order Granting Permanent Injunction granting Wingate declaratory relief, render judgment granting Premcor's request for declaratory relief that it has that use which is reasonable and necessary for the purposes outlined in the easements, on a case by case basis, but that use must be as little burdensome as possible to the servient owner, and we remand to the trial court to make that determination. In doing so, the trial court may consider the specific purpose in question which Premcor states is to "pig" an existing four or six inch

34

pipeline to check for anomalies, and the trial court may consider that Premcor conducted the 2021 pig run at issue without accessing Wingate's property.[5]

**Permanent Injunction**

In issue two, Premcor argues the trial court erred in granting a permanent injunction that limits its use and enjoyment of its general easements to a twenty-foot strip of land. Premcor contends Wingate failed to prove any of the necessary elements to show entitlement to a permanent injunction.

"To be entitled to a permanent injunction, a party must prove (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law." *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020) (citation omitted). We review the trial court's grant of injunctive relief and award of attorney's fees under an abuse of discretion standard. *See Narzynski v. River Plantation Cmty. Improvement Ass'n*, No. 09-21-00026-CV, 2023 WL 2180578, at *4 (Tex. App.—Beaumont Feb. 23, 2023, no pet.) (mem. op.) (citing *Bostow v. Bank of Am.*, No. 14-04-00256-CV, 2006 WL 89446, at *5 (Tex. App.—Houston [14th Dist.] Jan. 17, 2006, no pet.) (mem. op.) (addressing permanent injunction); *State*

---

[5]The trial court may also consider that in Premcor's Declaratory relief and Counterclaims, Premcor requested the trial court to declare its rights under the easement and that such right would include full access up and down the easement. That said, for the 2021 pig of the largest of its two pipelines, Premcor agreed it had only used twenty feet on the surface area along the course of its two pipelines, and Premcor did not allege at trial that it had any rights to Wingate's private roads or bridges located outside the easement.

*Farm Lloyds v. Webb*, No. 09-15-00408-CV, 2017 WL 1739763, at *11 (Tex. App.—Beaumont May 4, 2017, pet. denied) (mem. op.) (addressing attorneys' fees)). A trial court abuses its discretion when it acts arbitrarily and unreasonably or misapplies the law to the established facts of the case. *Id.* (citation omitted). Since a trial court cannot enjoin a party from activities that are a lawful and proper exercise of its rights, a trial court abuses its discretion by entering an injunction that enjoins lawful conduct. *See Holubec v. Brandenberger*, 111 S.W.3d 32, 39–40 (Tex. 2003); *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.) (citation omitted).

Here, the trial court enjoined Premcor from using more than a twenty-foot easement when Premcor has the legal right under the 1954 Gulf Easements of "'unlimited reasonable use as is reasonably necessary and convenient and as little burdensome as possible to the servient owner.'" *SWEPCO*, 595 S.W.3d at 689 (citing *Coleman*, 514 S.W.2d at 903). The 1954 Gulf Easements expressly grant Premcor the right to ingress and egress which gives Premcor the incidental right to enter and exit the specific tracts of land that were legally described in each ROW. *See Atmos Energy Corp.*, 598 S.W.3d at 458. Having already concluded the trial court erred by interpreting the 1954 Gulf Easements as having a fixed permanent width of twenty feet, and since the trial court's erroneous conclusion provided the basis for the permanent injunction, we conclude the trial court abused its discretion

36

by permanently enjoining Premcor from exercising its rights under the 1954 Gulf Easements to any area other than a defined twenty-foot centerline description. *See Holubec*, 111 S.W.3d at 39–40; *Webb*, 298 S.W.3d at 384.

Wingate failed to show he was entitled to a permanent injunction because there was no evidence showing Premcor committed a wrongful act. *See Pike*, 610 S.W.3d at 792. The evidence failed to demonstrate that Premcor had trespassed on Wingate's property, or that it was currently trespassing on his property. Instead, the record shows Premcor stated it would not use roadways on Wingate's property without his knowledge or cross his property other than using its right of way area, that it had informed Wingate it anticipated accessing down the ROW to drop the AGM boxes, and it conducted its 2021 pig run without entering its ROW on Wingate's property. The Amended Order Granting Permanent Injunction is based on Premcor's "threatened" exercise of use of Wingate property, including possible future use of Airport Road and Burrell Gully bridge.

Absent proof of the existence of an actual irreparable injury, Wingate is not entitled to injunctive relief. *Frey v. DeCordova Bend Ests. Owners Ass'n*, 647 S.W.2d 246, 248 (Tex. 1983) (citation omitted). "Moreover, fear or apprehension of the possibility of injury alone is not a basis for injunctive relief." *Id.* (citation omitted). "[A]n injunction will not lie to prevent an alleged threatened act, the commission of which is speculative and the injury from which is purely conjectural."

*Haden Emps. Ass'n v. Lovett*, 122 S.W.2d 230, 232 (Tex. Civ. App.—Galveston 1938, writ ref'd). Wingate's testimony about his fear, apprehension, or his belief in the possibility of Premcor entering his property outside of the ROW is insufficient to establish any injury, let alone irreparable injury. *See Markel v. World Flight, Inc.*, 938 S.W.2d 74, 79–80 (Tex. App.—San Antonio 1996, no writ) (citation omitted).

An injunction should not issue unless the party seeking the injunction shows the other party has or likely will engage in the activity enjoined. *See Morris v. Collins*, 881 S.W.2d 138, 140 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (citations omitted). Wingate's testimony merely shows he was afraid of Premcor trespassing on his property, but the evidence does not show his fear amounted to the existence of imminent harm. Wingate failed to prove that Premcor engaged in a wrongful act that caused Wingate irreparable injury, a necessary element of proving entitlement to an injunction. *See Pike*, 610 S.W.3d at 792.

Having concluded the trial court abused its discretion by permanently enjoining Premcor from exercising its rights under the 1954 Gulf Easements and using more than a twenty-foot easement at any time in the future, we vacate the portion of the trial court's Amended Order granting Wingate a permanent injunction. *See id.*; *Holubec*, 111 S.W.3d at 39–40; *Bostow*, 2006 WL 89446, at *5; *Webb*, 298 S.W.3d at 384; *see also Bennet v. Pol*, No. 09-15-00232-CV, 2016 WL 2941704, at *4 (Tex. App.—Beaumont May 19, 2016, no pet.) (vacating temporary injunction

where trial court did not have jurisdiction to issue injunctive order); *City of Beaumont v. Starvin Marvin's Bar & Grill, L.L.C.*, No. 09-11-00229-CV, 2011 WL 6748506, at \*6 (Tex. App.—Beaumont Dec. 22, 2011, pet. denied) (mem. op.) (same). We sustain issue two.

## Expert Witness Fees as Costs

In issue three, Premcor complains the trial court erred by awarding expert witness fees as court costs. Premcor argues expert witness fees are not taxable court costs.

We review a trial court's award of costs under an abuse of discretion standard. *CPM Trust v. City of Plano*, 461 S.W.3d 661, 674 (Tex. App.—Dallas 2015, no pet.); *see also Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 376 (Tex. 2001) (noting a trial court's ruling on costs under Rule 141 is within its sound discretion). Generally, expenses incurred in prosecuting and defending a suit are not recoverable as costs unless recovery is expressly provided by statute, rule, or other principles of equity. *CPM Trust*, 461 S.W.3d at 674. Whether an expense is recoverable under statute or rule as a court cost is a question of law we review de novo. *Id.* (citations omitted).

The Uniform Declaratory Judgment Act (UDJA) provides that a judge may include in its order or judgment all costs, including: (1) fees of the clerk and service fees due to the county; (2) court reporter fees; (3) masters, interpreters, and guardian

39

ad litem appointed pursuant to rules and statutes; and (4) other costs and fees as may be permitted by these rules and statutes. Tex. Civ. Prac. & Rem. Code Ann. § 31.007. The UDJA also grants the trial court discretion to award costs as are equitable and just. *Id.* § 37.009. Rule 131 of the Texas Rules of Civil Procedure provides that a successful party to a suit shall recover its court costs. Tex. R. Civ. P. 131. Rule 141 of the Texas Rules of Civil Procedure allows a court, for good cause, to allocate costs otherwise. Tex. R. Civ. P. 141; *see Headington Oil Co., L.P. v. White*, 287 S.W.3d 204, 212 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (explaining good cause is determined on a case-by-case basis and has meant that a prevailing party has unnecessarily prolonged the proceedings, unreasonably increased costs, or committed some other offense).

"However, the power to allocate costs does not encompass the power to tax as costs items that are not allowed as taxable court costs." *May v. Ticor Title Ins.*, 422 S.W.3d 93, 106 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citations omitted). "Generally, in Texas, expert fees are not recoverable as court costs." *Id.* (citing *Bundren v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 440 (Tex. App.—Dallas 2011, pet. denied)). "Regardless of any good cause shown, costs of experts are 'merely incidental expenses in preparation for trial and not recoverable.'" *Whitley v. King*, 581 S.W.2d 541, 543–44 (Tex. Civ. App.—Fort Worth 1979, no writ) (citation omitted); *see Petrello v. Prucka*, 415 S.W.3d 420, 433 (Tex. App.—

40

Houston [1st Dist.] 2013, no pet.) (explaining recovery of costs does not generally permit the recovery of litigation expenses); *Taormina v. Culicchia*, 355 S.W.2d 569, 575–76 (Tex. Civ. App.—El Paso 1962, writ ref'd n.r.e.) (stating plaintiff could not recover expenses of auditor when auditor was not appointed by the court but worked solely on plaintiff's behalf at the plaintiff's request for the purpose of testifying at trial). Generally, costs do not extend to the expenses of an expert witness who was not appointed by the court but who was instead a witness only for one side. *12636 Rsch. Ltd. v. Indian Bros., Inc.*, No. 03-19-00078-CV, 2021 WL 417027, at *19 (Tex. App.—Austin Feb. 5, 2021, no pet.) (mem. op.) (citation omitted).

In its Amended Order, the trial court ordered Wingate to recover costs and expenses of $65,979, the amount Wingate requested in his post-trial brief. Wingate included an invoice for $58,995 in expert witness fees for Wade, who testified solely on Wingate's behalf, and an invoice for $2,660 in expert fees for Patrick Dean Brinkley, who only offered an opinion on the reasonableness of Wingate's counsel's legal fees. The trial court's bill of costs totals $2,243 and does not include any expert witness fees.

The record shows that Wade and Brinkley were not neutral court-appointed experts but performed services solely for Wingate before trial. In Wingate's First Supplemental Expert Disclosures filed before the January 2022 trial, he designated Wade as a retained testifying expert and Brinkley as an attorney fees consultant. The

41

clerk's record shows Wade was included in Wingate's emails as early as May 2021, eight months before trial, and Wingate referred to Wade as his legal expert in his First Amended Motion for Sanctions filed in August 2021. The record also shows that the first mention of "appointed" experts was in the trial court's Findings of Fact and Conclusions of Law, which states:

> The legal expert presented by Mr. Wingate and the legal expert presented by Premcor, having aided the Court in this complex matter, are deemed appointed by the Court and the costs of these expert fees awarded at Premcor's expense as equitable and just. Mr. Wingate is awarded such costs and expenses in the amount of $65,979 from Premcor.

Even in circumstances where the trial court can appoint expert witnesses and charge their fees as expenses, the trial court has no authority to assess expert expenses as costs if it did not appoint the expert. *See Whitley*, 581 S.W.2d at 543–44; *Taormina*, 355 S.W.2d at 575–76. Under these circumstances, we conclude the trial court erred by awarding Wingate's expert witness fees as costs when Wingate designated his expert witnesses, who worked solely on his behalf, before trial, and the trial court's appointment did not occur until after trial. *See Whitley*, 581 S.W.2d at 543–44; *Taormina*, 355 S.W.2d at 575–76; *12636 Rsch. Ltd.*, 2021 WL 417027, at *19. Additionally, Wingate has not pointed us to any statute or rule pertaining to the subject matter of this suit that authorizes the recovery of expert witness fees as costs. *See Bundren*, 347 S.W.3d at 440. We sustain issue three and reverse the

portion of the trial court's Amended Order awarding Wingate expert witness fees as costs and remand for further proceedings consistent with this opinion.

**Attorney's Fees**

In issue four, Premcor argues that after the trial court granted Wingate's request for a declaratory judgment, the trial court erred by awarding Wingate $233,280 in attorney's fees for the trial court proceeding and $20,000 in conditional appellate attorneys' fees. Premcor complains the trial court erroneously awarded Wingate attorneys' fees and that the trial court should have required Wingate to segregate his attorneys' fees.

We review an award of attorney's fees under the UDJA for an abuse of discretion. *Ullrich v. Meijer*, No. 09-21-00090-CV, 2022 WL 17350948, at *4 (Tex. App.—Beaumont Dec. 1, 2022, no pet.) (mem. op.). Under the UDJA, an award of attorney's fees is committed to the trial court's sound discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (discussing Tex. Civ. Prac. & Rem. Code Ann. § 37.009); *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 522 S.W.3d 471, 494 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (noting trial court's "broad discretion" to award attorney's fees under the UDJA). A trial court may award necessary attorney's fees as are equitable and just. Tex. Civ. Prac. & Rem. Code Ann. § 37.009. The determination of whether an award of attorney's fees would be equitable and just is not susceptible to direct proof but instead is a matter

43

of fairness in light of the circumstances. *Anglo-Dutch Petroleum Int'l, Inc.*, 522 S.W.3d at 494. Even if the evidence is uncontroverted that the attorney's fees are reasonable and necessary, a court may decide it is not equitable or just to award them. *Ullrich*, 2022 WL 17350948, at *4 (citation omitted). Additionally, since an award of attorney's fees in a declaratory judgment is not dependent on a finding that a party has substantially prevailed, the trial court is not required to award attorney's fees to a prevailing party. *Id.* (citation omitted).

Whether the fees are reasonable and necessary are questions of fact, but the question of whether the fees are equitable and just are questions of law. *Bocquet*, 972 S.W.2d at 21. A trial court abuses its discretion when it rules arbitrarily, unreasonably, or without reference to any guiding principles or supporting evidence. *Anglo-Dutch Petroleum Int'l, Inc.*, 522 S.W.3d at 494. Thus, our review of attorney's fees also includes whether the trial court abused its discretion by awarding fees when there was insufficient evidence that the fees were reasonable and necessary. *See Bocquet*, 972 S.W.2d at 21.

Premcor complains the trial court erroneously awarded Wingate his total amount of attorneys' fees without requiring Wingate to segregate his fees. Texas law does not allow a party to recover attorney's fees unless authorized by a statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006) (citations omitted). Parties seeking attorney's fees are required to segregate fees

between claims for which they are recoverable and claims for which they are not. *Id.* at 311 (citations omitted). The need to segregate attorney's fees is a question of law, and the extent which claims can or cannot be segregated is a mixed question of law and fact. *Id.* at 312–13. The party seeking attorney's fees has the burden to prove that segregation is not required. *Sustainable Tex. Oyster Res. Mgmt., L.L.C. v. Hannah-Reef, Inc.*, 623 S.W.3d 851, 872 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (citations omitted). "'Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.'" *Id.* (quoting *Chapa*, 212 S.W.3d at 313–14.). In addition to his claim for declaratory relief, Wingate sought a Temporary Restraining Order, Temporary and Permanent Injunction, sanctions, and asserted a claim for abuse of process. Wingate argued he was not required to segregate because his claims were inextricably intertwined.

The trial court's grant of attorneys' fees was based on its determination that the 1954 Gulf Easements should be declared to have a fixed permanent width of twenty feet. Since we have held the trial court erred by determining the 1954 Gulf Easements have a fixed width and by granting a declaratory judgment and permanent injunction in Wingate's favor, we reverse the portion of the trial court's Amended Order awarding Wingate attorneys' fees. We remand the issue of attorneys' fees to the trial court to determine whether it granted reasonable and necessary attorneys'

45

fees which are equitable and just considering our holdings and the issues still to be decided on remand. *See City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 646 (Tex. 2013); *Benders Landing Ests. Property Owners Ass'n, Inc. v. LGI Land, LLC*, No. 09-16-00183-CV, 2018 WL 1188814, at \*5 (Tex. App.—Beaumont Mar. 8, 2018, no pet.) (mem. op.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 37.009). The trial court's determination of attorneys' fees, if any, should include whether the party seeking attorneys' fees has proved segregation is not required. *See Sustainable Tex. Oyster Res. Mgmt., L.L.C.*, 623 S.W.3d at 872. We sustain issue four.

## CONCLUSION

Having concluded the trial court erred by granting Wingate declaratory relief and declaring a permanent fixed width of twenty feet, we reverse the portion of the trial court's Amended Order Granting Permanent Injunction granting Wingate declaratory relief, render judgment granting in part Premcor's request for declaratory relief that the nine Wingate Easements convey such use as is reasonably necessary and convenient and which is as little burdensome as possible to the servient owner, and we remand to the trial court to determine what Premcor's use should be in this case for the particular project in question. We vacate the portion of the trial court's Amended Order granting Wingate a permanent injunction. We reverse the portions of the Amended Order awarding Wingate expert witness fees as costs and attorneys'

fees and remand those issues to the trial court for further proceedings consistent with this opinion.

REVERSED AND RENDERED IN PART; REVERSED AND VACATED IN PART; REVERSED AND REMANDED IN PART.


W. SCOTT GOLEMON
Chief Justice


Submitted on January 25, 2024
Opinion Delivered April 11, 2024

Before Golemon, C.J., Johnson and Wright, JJ.